**Pages 1 - 18**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

```
LINDA PARKER PENNINGTON, et al.,   )
                                   )
         Plaintiffs,               )
                                   )
   VS.                             )   NO. C 18-05330 JD
                                   )
TETRA TECH, INC.; TETRA TECH EC,   )
INC.; LENNAR CORPORATION; HPS1 BLOCK )
50 LLC; HPS1 BLOCK 51 LLC;  HPS1   )
BLOCK 53 LLC;  HPS1 BLOCK 54 LLC;  )
HPS1 BLOCK 56/57 LLC; HPS          )
DEVELOPMENT CO.; FIVEPOINT HOLDINGS, )
LLC; BILL DOUGHERTY; ANDREW BOLT;  )
EMILE HADDAD; and DOES 1-100,      )
                                   )
         Defendants.               )
_____)
```

                          San Francisco, California
                          Thursday, October 14, 2021

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                  COTCHETT, PITRE & McCARTHY, LLP
                  San Francisco Airport Office Center
                  840 Malcolm Road
                  Burlingame, California 94010
        **BY: ANNE MARIE MURPHY**
                 **DONALD "DUFFY" J. MAGILLIGAN**
                 **ATTORNEYS AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official U.S. Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:
                         GIBBS LAW GROUP LLP
 3                       505 14th Street, Suite 1110
                         Oakland, California 94612
 4               BY:     AMANDA M. KARL
                         ATTORNEY AT LAW
 5


 6                       BOWLES & VERNA
                         2121 N. California Boulevard, Suite 875
 7                       Walnut Creek, California 94596
                 BY:     BRADLEY R. BOWLES
 8                       ATTORNEY AT LAW


 9

10   For Defendants Tetra Tech, Inc. and Tetra Tech EC, Inc., and
     Andrew Bolt:
11                       HANSON BRIDGETT LLP
                         425 Market Street, 26th Floor
12                       San Francisco, California 94105
                 BY:     CHRISTOPHER A. RHEINHEIMER
13                       DAVINA PUJARI
                         ATTORNEYS AT LAW
14

15   For Lennar Defendants:
                         O'MELVENY & MYERS LLP
16                       Two Embarcadero Center, 28th Floor
                         San Francisco, California 94111
17                       GEOFFREY H. YOST
                         MADHU R. POCHA
18                       ERIC ORMSBY
                         ATTORNEYS AT LAW
19

20   For Defendants FivePoint Holdings and Emile Haddad
                         ALSTON & BIRD LLP
21                       333 South Hope Street, 16th Floor
                         Los Angeles, California 90071-1410
22               BY:     GREGORY S. BERLIN
                         ATTORNEY AT LAW
23

24

25
```

| | |
|---|---|
| **Thursday - October 14, 2021** | **10:21 a.m.** |

**P R O C E E D I N G S**

---o0o---

THE CLERK: Calling Civil 18-5330, Pennington, et al. versus Tetra Tech, Inc., et al.

THE COURT: Thank you.

THE CLERK: Counsel?

MS. MURPHY: Good morning, Your Honor. Anne Marie Murphy of Cotchett, Pitre & McCarthy for plaintiffs and the class.

MR. MAGILLIGAN: Good morning, Your Honor. Donald Magilligan for the plaintiffs.

MS. KARL: Good morning, Your Honor. Amanda Karl from Gibbs Law Group for the plaintiffs.

MR. BOWLES: Good morning, Your Honor. Brad Bowles for the plaintiffs.

MR. YOST: Good morning, Your Honor. Geoff Yost, Madhu Pocha, and Eric Ormsby for the Lennar defendants.

MR. RHEINHEIMER: Good morning, Your Honor. Chris Rheinheimer and Davina Pujari for the Tetra Tech, Inc.; Tetra Tech EC, Inc.; and Andrew Bolt defendants.

MR. BERLIN: Good morning, Your Honor. Gregory Berlin on behalf of defendant FivePoint Holdings and Emile Haddad.

THE COURT: Okay. All right. Who is going to take the lead for the home- -- I'll just call them the homebuilders.

MR. YOST: I'll take the lead, Your Honor. Geoff Yost.

1    **THE COURT:** Mr. Yost? Okay.

2    And who's going to take the lead for Tetra Tech?

3    **MR. RHEINHEIMER:** I will, Your Honor. Chris Rheinheimer.

4    **THE COURT:** Okay. And who's going to take the lead for

5    the plaintiffs?

6    **MS. MURPHY:** I am, Your Honor. Anne Marie Murphy.

7    **THE COURT:** Okay. All right. So here's what I'm

8    thinking. We did a little thought experiment, so just trying

9    to figure out whether the settlement is going to be in good

10   faith between the two alleged tortfeasors.

11   So the two alleged tortfeasors are Tetra Tech and the

12   homebuilders. All right? So let's just say, for the sake of

13   starting the discussion, it's 50-50 between the two them.

14   Okay? Starting point. So who knows what would happen, but

15   it's a fair starting point. Two tortfeasors. We'll start with

16   the idea that we'll split it evenly between them. And now we

17   can start making some adjustments.

18   So everybody agrees that $48 million is more or less the

19   liability pot that the plaintiffs are entitled to, just for

20   discussion. Nobody's making any promises, of course. So half

21   of 48 million would be 24 million per tortfeasor -- okay? --

22   for homebuilders and Tetra Tech.

23   But we have the complication of -- we have the wrinkle, I

24   should say. It's not a complication. We have the wrinkle that

25   in May 2018 the homebuilders disclosed to potential buyers the

1  guilty pleas in this Court for the two defendants and the
2  implications for what that might mean with respect to risks on
3  the home buyer sites.
4      And the homebuilders have said if you cut off liability
5  after the date of those May 2018 disclosures, that would still
6  leave about half the class purchasing before May of 2018.
7      Does that sound right to everybody so far, Ms. Murphy?
8  Just factually?  Just at a rough level?
9      **MS. MURPHY:**  Yes.
10     **THE COURT:**  Okay.  Mr. Yost?
11     **MR. YOST:**  Sounds fair, Your Honor.
12     **THE COURT:**  Mr. Rheinheimer?
13     **MR. RHEINHEIMER:**  So far, I'm following.
14     **THE COURT:**  Okay.  So then we'll take that 24 million and
15  we'll slash that in half.  So that's about 12 million left on
16  the homebuilder's side.  Okay?  And the actual settlement
17  before me right now is 6.3 million.
18     So as a thought experiment, we're really just going from
19  12 million to 6.3 million.  Under the California Supreme
20  Court's guidance in *Tech-Bilt*, that seems reasonable.  It
21  doesn't give me any heartburn over being grossly unfair or
22  disproportionate or leaving somebody holding a larger bag than
23  they should be holding.  And that's kind of where I'm thinking.
24     So, Ms. Murphy, what do you think about all that?
25     **MS. MURPHY:**  Well, I think there's logic to what you're

1   saying.  We still believe our economic damages are the
2   48 million, but I don't disagree with what your analysis is.
3       **THE COURT:**  All right.  Mr. Yost?
4       **MR. YOST:**  We agree with the Court's analysis.  And that
5   would mean our proportional settlement was over 50 percent of
6   the approximated damages for plaintiffs.
7       **THE COURT:**  It's not bad.  I mean, that's more than usual.
8       **MR. YOST:**  Yes.  Well within the case law.  And this
9   district and the California Supreme Court have all approved
10  settlements down in the 5 to 10 percent range.
11      **THE COURT:**  I don't --
12      **MR. YOST:**  And this is over 50 percent.
13      **THE COURT:**  -- but I know other people do.
14      Mr. Rheinheimer, what do you think?
15      **MR. RHEINHEIMER:**  Your Honor, there's one wrinkle that
16  I think kind of torpedoes that --
17      **THE COURT:**  Okay.
18      **MR. RHEINHEIMER:**  -- analogy; and that is, according to
19  the Reynolds declaration submitted with the motion for final
20  approval, those late purchasers were not entitled to diminution
21  damages.
22      They didn't get, as part of the settlement, payments for
23  the failure to increase in price as much as it should have.
24  Instead, all they got is a small proportional share of the
25  Mello-Roos taxes.  The total Mello-Roos damages were purported

1  to be about 5 million.  So the diminution in value is the vast
2  majority of the claim.
3      So even under this hypothetical, that disclosure has
4  already been priced into their settlement, and so it doesn't
5  change the calculus.
6      **THE COURT:**  Well, it does because you're -- Tetra Tech,
7  you're trying to tell me it's 48 million versus 6.3.  And
8  I think that's the wrong starting point, is what I'm saying.
9  I think it's 12 million versus 6.3.
10     **MR. RHEINHEIMER:**  And, Your Honor, I understand.  And I
11 get the division, divided by 2 to get the 24 million.  We
12 disagree that it should be 50-50, but for this thought
13 experiment, I'm accepting that just as a first level.
14     It's getting from 24 million to 12 that doesn't make sense
15 because the damages that comprise that 24 million are being
16 paid almost entirely to the early purchasers.  According to
17 plaintiffs' expert declaration from Mr. Reynolds, Mr. Reynolds
18 didn't attribute diminution in value or failure to appreciate
19 damages to late purchasers because they already knew.
20     So this thought experiment about the damage being divided
21 by 24 million, by a half again, doesn't make sense in the
22 context of how plaintiffs are dividing the settlement.  They're
23 not --
24     **THE COURT:**  Well, I'll tell you what.  I'm not taking a
25 stand on that one way or the other right now, but let's just

1  roll with it for discussion purposes.
2      24 million to 6 million is still about 25 percent.  I
3  mean, that's generally a typically not bad settlement.  So
4  what's wrong with that?
5      **MR. RHEINHEIMER:**  So then I would step back and say, going
6  from 48 to 24 has some issues with the evidence.  Right?  We
7  can't just assume, based on the evidence, that it's 50-50
8  liability.  We've presented --
9      **THE COURT:**  Well, what's wrong with that?  I mean --
10     **MR. RHEINHEIMER:**  The large majority of the damages are
11 based on these buyers purportedly not knowing the situation
12 when they purchased.  Had they known what was going on, they
13 would have paid a fair price based on these allegations.
14     That's tied entirely up with the disclosure, the party
15 that is owed -- or that has a duty -- that owes a duty to
16 disclose to these plaintiffs.  That's --
17     **THE COURT:**  Let me ask you this, just to jump in.
18     You filed a mountain of things, which was slightly
19 improper, in my view; but in any event, we looked at them or at
20 least the ones highlighted in your brief.
21     Prior to the guilty pleas that I took in May or so of
22 2018, I just didn't see anything that -- well, let me ask you
23 this:  What do you think is the best document that should have
24 put your co-defendants on notice that they had a duty to
25 disclose?

1   **MR. RHEINHEIMER:**  So the best document, in terms of the
2   allegations relating to Tetra Tech, is the executive summary,
3   the table from the executive summary, which they learned about
4   in 2014.  And they were -- we actually --
5       **THE COURT:**  Well, what's the --
6       **MR. RHEINHEIMER:**  -- have evidence --
7       **THE COURT:**  Just to make sure we're all on the same page,
8   what's the cite for that?
9       **MR. RHEINHEIMER:**  Exhibit 3 is the --
10      **THE COURT:**  So, docket number?
11      **MR. RHEINHEIMER:**  I'm sorry?
12      **THE COURT:**  What's the docket number?
13      **MR. YOST:**  ECF 2 -- 204-4.
14      **THE COURT:**  Docket number?  Like 201-4.  What is it?
15      **MR. YOST:**  204-4, I believe, Your Honor.
16      **THE COURT:**  204-4.  Okay.  All right.  Go ahead.
17      **MR. RHEINHEIMER:**  That executive summary is the best
18  evidence of what knowledge was out there relating to --
19      **THE COURT:**  204-4, that's your best one, you think?
20      **MR. RHEINHEIMER:**  That's the best relating to the evidence
21  of the allegations.
22      **THE COURT:**  I thought you were going to rely on 204-16,
23  which was the Mayor's meeting minutes.  But you think 204-4 is
24  your best one?
25      **MR. RHEINHEIMER:**  204-16 is important as well.  That

1  also -- and there's a number of exhibits -- goes towards
2  knowledge of delay.
3       **THE COURT:**  Well, don't let me derail you.  Let's stick
4  with your -- you picked 204-4 as your favorite.  So just keep
5  going with that one.  What's in there that you think triggered
6  the disclosure requirement?
7       **MR. RHEINHEIMER:**  It's the table in there, in that
8  exhibit.
9       Let me get to that page.  My apologies, Your Honor.
10      So there's the table and the executive summary that
11 identifies areas that need to be potentially reworked.  And if
12 you compare that table with the survey unit areas disclosed in
13 the Rolfe and Hubbard pleas, that table incorporates all of
14 those areas and more, meaning there was knowledge of the issues
15 related to survey areas being potentially redone for everything
16 disclosed in the Rolfe and Hubbard pleas and more well before
17 the pleas were unsealed in May 2018.
18      **THE COURT:**  Okay.  Mr. Yost?
19      **MR. YOST:**  Your Honor, this self-report by Tetra Tech from
20 April of 2014 was publicly available as of October of 2014,
21 when it was disclosed to the press, reported on television,
22 Internet newspapers.  The first homes sold by Lennar on
23 Parcel A were not until six months later, in April of 2015.
24      We also contend that this self-report by Tetra Tech was a
25 whitewash, frankly.

**THE COURT:** Well, I would prefer to hear more about that.

I will be candid with you. I'm a little doubtful of the argument that it was sort of a buyer beware market and people should have been -- it's just not right.

You buy a house. You can't later say: Well, the earth was seeded with radioactivity and the *Chronicle* reported that; so it's all on you.

I'm not really -- that is not, in my view, a fair shake.

But I do want to hear more about why you think it may be a whitewash or why it didn't trigger a duty, both. Okay? But let's start with the -- your word, "whitewash," let's start with that.

**MR. YOST:** So the conclusion at 204-4, page 6 of 9, second-to-last paragraph, this is Tetra Tech's conclusion about their own investigation.

(Reading):

> "Completion of these corrective actions has resulted in consistent, high-quality Final Status Survey results."
>
> "Tetra Tech EC has not had a recurrence of the type of soil sample results that led to this investigation, indicating that the corrective actions have addressed the problem."

And they're reporting on alleged testing issues that date back to April of 2012.

1  **THE COURT:** So what you're saying, in effect, is
2  Tetra Tech assured everybody: No problem. It's clean. It's
3  clean, safe, and ready to go.
4  **MR. YOST:** That's correct.
5  **THE COURT:** Doesn't seem like an unfair reading,
6  Mr. Rheinheimer.
7  **MR. RHEINHEIMER:** Your Honor, in the context of this
8  motion, the argument that the developers made was that the
9  pleas being unsealed disclosed information that they didn't
10 know before.
11      What none of Mr. Yost's argument does is tie any of what
12 he's saying to the pleas, the information in the plea
13 agreements that they learned that enabled them to disclose
14 things to the buyers. There was nothing --
15 **THE COURT:** Well, let me -- I can probably fill that in
16 for you.
17     Now, remember, you have the burden. You're the party
18 objecting to the good faith. So it's not on Mr. Yost; it's on
19 you to tell me why this is unfair.
20     204-4, I don't have it right here, but my recollection is
21 it was a happy report. Tetra Tech was not confessing error or
22 danger. It was quite the opposite. It was trying to assure
23 the world that things looked okay. I'll look at it again, but
24 that's my recollection, and what Mr. Yost just read is
25 consistent with that.

1    But the guilty pleas are different because guilty pleas
2 admit all relevant facts that support the plea.  So by pleading
3 guilty, it was now a matter of fact that the two employees had
4 hid or otherwise adulterated the radiation results and misled
5 the Government or whoever -- but let's just say misled
6 somebody -- with false assurances that radioactivity safety
7 levels had been achieved when, in fact, they had not.
8    I mean, to me, there's no doubt that the homebuilders and
9 developers did the right thing at that point because that was a
10 factual admission and the guilty plea is premised on that being
11 a true fact.  So I'm okay with that, and they did the right
12 thing, and from your papers, I don't think you disagree.  I
13 mean, everybody sort of picked May 2018 as the turning point,
14 and that makes sense to me.
15    But what about these Mayor minutes -- meetings with the
16 Mayor, minutes at 204-16?  I just didn't really see anything in
17 there that said clearly -- I mean, I'd like to have you point
18 it to me.  But what in there, sort of, in your view, was a red
19 flag for the developers and homebuilders?
20    **MR. RHEINHEIMER:**  And, Your Honor, just to quickly loop
21 back to the executive summary report.
22    That report did say that samples were taken in places that
23 weren't indicated.  That's what the report said.  And they
24 needed to be revisited, those survey units.
25    **THE COURT:**  Okay.

1  **MR. RHEINHEIMER:** With respect to ECF-16, which is Exhibit 15 to my declaration, the concern expressed in the meeting minutes is that there's going to be a delay. That's a significant portion, as far as we understand it, of plaintiffs' claimed damages, is that there's a delay in doing transfers and additional construction on additional parcels to get that complete neighborhood that Lennar promised. You know, the plaintiffs' complaint has the pictures of this park and commercial areas, and they didn't get that.

And so in the February 22nd, 2017, meeting, the fact that there was very likely going to be a delay was disclosed amongst the stakeholders, and the meetings reflect that, and the developers were there.

**THE COURT:** All right. Mr. Yost?

**MR. YOST:** Your Honor, there are always delays in construction projects, particularly with brownfields. This is not news. It wasn't until the United States' victim impact statement, I believe in the summer of 2018, that they actually put a figure on those delays and said this could be delayed for ten years. So that was after the pleas came out.

At this point, you could probably comb the record and find complaints about delays consistently throughout this project dating back to the 2000s.

**THE COURT:** Can you give me some examples?

**MR. YOST:** They're not in the record, Your Honor.

1  They're --
2     **THE COURT:** Oh, all right. If they're not in the record,
3  that's fine.
4     **MR. YOST:** Constant meetings, yes.
5     **THE COURT:** All right. Okay.
6     **MR. YOST:** The other thing is that where these samples
7  were taken, as reflected in the April 2014 Tetra Tech report,
8  was on Parcel G. These houses are on Parcel A which has been
9  consistently declared to be suitable for residential
10 development, and there has been no substantial finding of
11 radionuclides on -- directly on Parcel A. So we're talking
12 about adjacent parcels.
13    The other thing is, let's assume, for the sake of
14 argument, that developers did know as of April of 2014
15 everything that was in the plea agreements that came out in
16 2015.
17    **THE COURT:** In twenty- --
18    **MR. YOST:** In 2014 -- in 2018. Sorry, Your Honor.
19    So we're not here to resolve the merits. We're here to
20 estimate, approximate the homebuilder's proportional liability.
21    So Tetra Tech alleges that homebuilders should be the
22 primary wrongdoers. That's not what the plaintiffs contend.
23 The plaintiffs contend that we're the lesser wrongdoers and, in
24 fact, acknowledged in their preliminary approval motion that
25 Tetra Tech could be found 90 percent responsible for

plaintiffs' damages and we could be held 10 percent responsible. Under that scenario, our settlement would be beyond our proportional liability.

We don't need to resolve the merits today. The question is whether our settlement is grossly disproportionate with our liability. And our settlement is 12 percent, well within the range of reasonable settlements, even if you assume that homebuilders are entirely responsible for all 48 -- it's actually now $52 million economic damages.

**THE COURT:** I had 13 percent.

**MR. YOST:** It was 13 percent of 48. I think in the final approval motion, a couple more class members were added, and now it's 52.

**THE COURT:** Oh, okay. All right. So it's 12 to 13 percent even of the total amount?

**MR. YOST:** That's correct.

**THE COURT:** Okay.

Okay. Mr. Rheinheimer, any final thoughts?

**MR. RHEINHEIMER:** Just to respond to the issue about what the plaintiffs allege.

The plaintiffs do allege that Tetra Tech is primarily responsible based on the belief that there's no evidence that developers knew.

Well, there is evidence that developers knew. So the basis of that allegation is incorrect. And that's why this is

1  different than just accepting at face value what the plaintiffs
2  allege for the purpose of analyzing the good faith settlement.
3      **THE COURT:** Well, I mean, given the California Supreme
4  Court's clear emphasis on being reasonable and promoting,
5  encouraging settlements, I mean, let's just take that last
6  point.
7      Even if you -- disproportionately and unfairly, in my
8  view, but just for thought experiment -- assigned 100 percent
9  liability to the homeowners and the builders, it's still a
10 12 percent settlement.  I mean, it's not shockingly low.
11     **MR. RHEINHEIMER:** It's not nothing, Your Honor, but I
12 haven't seen any case -- outside of the CERCLA context, which
13 has unique federal interests in resolving settlements.  So
14 outside of the CERCLA context, I have not found any case that
15 has viewed a 12 percent settlement with 100 percent
16 proportionate share to be a good faith settlement.
17     **THE COURT:** Well, you may be surprised to know that in
18 consumer space, it happens all the time.  And, in fact, it's
19 rarely 12 percent; it's more like 4 percent.  So I do that day
20 in, day out, much to my chagrin.  12 percent would look great
21 compared to a lot of the consumer settlements that I get and
22 have to wrestle with.  So any double digit, it's typically a
23 very good day for consumer cases.  In fact, that's often triple
24 what I'm proposed.  So I'm not sure that's a good argument.
25     But anyway, okay.  Well, Ms. Murphy, this was really

1  between your colleagues on the other side, but any other
2  thoughts plaintiffs want to add?
3      **MS. MURPHY:**  No.  Just one other point.  I mean, there
4  have been no objections and no opt-outs, and the settlement is
5  getting real money into the hands of homeowners.
6      And we can all, I think, imagine -- you've been moving the
7  cases along very quickly, given how complicated they are.  But
8  we also can see that they could take several more years.
9      And so this is a settlement that is supported by the
10 homeowners.  And by virtue of the fact that we haven't had
11 opt-outs or objections, that's an indication that they're fair.
12     **THE COURT:**  Okay.  Okay.  I am leaning towards approval,
13 but I'll think a little bit more, and I'll get this out when I
14 can.  Okay?
15     All right.  Thanks, everyone.
16     **MR. YOST:**  Thank you, Your Honor.
17     **MR. RHEINHEIMER:**  Thank you, Your Honor.
18     **THE CLERK:**  All rise.  Court's in recess.
19             (Proceedings adjourned at 10:43 a.m.)
20                        ---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Tuesday, October 19, 2021

*Ana Dub*
_____

Ana Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
Official United States Reporter